IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HARLAN I. JOHNSON, SR.          :     CIVIL ACTION
                                :
        v.                      :
                                :
DELAWARE COUNTY JUVENILE        :
DETENTION CENTER                :     NO. 11-1166

MEMORANDUM

Dalzell, J.                                      June 3, 2013

        Harlan I. Johnson, Sr. brings this employment

discrimination action against the Delaware County Juvenile

Detention Center.  Johnson alleges that in firing him the

Detention Center discriminated against him based on his race in

violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §

2000e et seq., based on his age in violation of the Age

Discrimination in Employment Act, 29 U.S.C. § 626, and based on

both race and age in violation of the Pennsylvania Human

Relations Act.

        The Detention Center moved to dismiss Johnson's

amended complaint in its entirety.  On March 16, 2012, we denied

this motion except with respect to Count II of Johnson's amended

complaint, alleging a violation of the 1866 Civil Rights Act,

and Count V, alleging a violation of Johnson's rights under the

First Amendment.  Johnson informed the Court that he would not

pursue either claim, and so we dismissed these counts.

I.    Procedural History and Undisputed Facts

         In our March 26, 2012 Memorandum we relied on the
facts as pled in the complaint, and we now consider the
undisputed facts in the record before us.

         Johnson is an African-American man born in 1957, and
he began work as a detention officer at the Detention Center on
June 13, 1994.  Joint Pretrial Stipulation (hereinafter "Stip.
Facts") at 1-2.  The Detention Center is governed by the Board
of Judges of the Court of Common Pleas of Delaware County --
Pennsylvania's Thirty-Second Judicial District -- and it
provides temporary detention of young people who are alleged to
have committed crimes.  Id. at 2.  From January 1999 until
December 2010, Ronald Berry was the Director and highest officer
at the Detention Center.  Id.

         Detention Center employees work under a collective
bargaining agreement (CBA) with the American Federation of
State, County and Municipal Employees, District Council 88
(AFSCME) which provides that employees may only be discharged
for cause.  Pl. Resp. in Opp. Ex. 1 at 35.  A Supplementary
Agreement governs the economic terms of the subset of Judicial
District employees within the larger bargaining unit of county
employees.  Id. at 44-45.  For employees covered by this

supplemental agreement, the Delaware County Court of Common Pleas, rather than an arbitrator, hears their discharge grievances.  Stip. Facts at 2.

Because the role of judges in the employment of Judicial District employees plays a significant role in our determination here, we will explain that role further.  In Ellenbogen v. County of Allegheny, 479 Pa. 429 (Pa. 1978), the Pennsylvania Supreme Court explained that the General Assembly had recently amended the County Code to give county commissioners the exclusive authority to represent managerial interests "in representation proceedings and at the bargaining table" when employees paid from the county treasury exercised their collective bargaining rights.  Id. at 435.  Specifically, the amendment to the County Code provided that "with respect to representation proceedings before the Pennsylvania Labor Relations Board or collective bargaining negotiations involving any or all employe[e]s paid from the county treasury, the board of county commissioners shall have the sole power and responsibility to represent judges of the court of common pleas", id. (quoting 16 P.S. § 1620).  Though some employees "paid from the county treasury" are employees of Pennsylvania's judicial districts, the General Assembly gave county

3

commissioners -- rather than judges -- this bargaining responsibility in order to advance several policy aims, which the Pennsylvania Supreme Court described at length.  Id. at 436-37 (explaining that this system promotes fiscal responsibility, consolidates decision-making authority during bargaining, allows judges to focus on judicial responsibilities, and avoids the potential impropriety of "judges deciding appeals arising from proceedings in which they sat . . . at the bargaining table").

But the General Assembly provided within this amendment that judges would retain their "hiring, discharging, and supervising rights and obligations with respect to such employe[e]s."  Id. at 435 (quoting 16 P.S. § 1620).  Section 1620 does not explain whether judges' discharge rights require that Judicial District employees work "at-will."  It does not explain, for example, whether retaining the judges' discharge authority means that Judicial District employees covered by collective bargaining agreements that provide for "for cause" discharge are nevertheless at-will employees, or whether judges merely retain the discretion to determine whether there exists cause for termination.  We will return to this question below.

The Delaware County Juvenile Detention Center Policies and Procedures handbook explains that under the CBA, "Any

employee shall be subject to an immediate discharge without notice" for reasons including "[a]bsenting one's self without supervisory permission from the customary place of his work assignment", Policies and Procedures Manual at 3.1.13; Def. MSJ Ex. A at 16. The manual also provides that

> Detention Officer[s] . . . are not permitted to bring cellular phones . . . into the facility. Supervision of the residents can not be accomplished by someone who has their attention focused on personal phone calls . . . Staff who violate this policy are subject to discipline up [to] and including termination.

Id. at 3.1.15.

On May 15, 2006, in an incident not directly in issue here, Berry fired Johnson for absence from his assigned duty station. Stip. Facts at 2. Johnson and AFSCME grieved his termination. Judge Edward J. Zetusky, Jr. presided over a hearing on the grievance and issued an order on December 11, 2006 setting aside Johnson's termination. Id. As a condition of Johnson's reinstatement, Judge Zetusky ordered that if in the future Johnson "absents himself from his assigned duty station, for any reason, without permission, he will be subject to immediate termination", id. at 3.

On January 11, 2010, while Johnson was on duty in Unit C-1, he conducted a cellular phone call for about five minutes

in an area containing a stairwell and staff lockers.  Id. at 3.
That area is inaccessible to inmates and the phone conversation
took place in front of surveillance cameras.  Id.  On January
19, 2010, Berry fired Johnson for violating Judge Zetusky's
Order and the Detention Center's cellular phone policy.  Id.

Johnson filed a grievance of that termination, and
Judge Chad F. Kenney, Sr. of the Delaware County Court of Common
Pleas presided over the hearing.  Judge Kenney affirmed Berry's
decision and issued an order in which he found (1) "Mr. Johnson
may have stayed within the confines of the 'C-1 Unit', however,
the surveillance video clearly showed that Mr. Johnson left the
place of his work assignment", and (2) "Harlan Johnson is found
to have absented himself from his assigned duty station without
supervisory permission".  Id.

Johnson filed a charge of discrimination based on race
and age with the Equal Employment Opportunity Commission (EEOC)
in April of 2010 and with the Pennsylvania Human Relations
Commission within 180 days of his termination date.  Id. at 4.

Johnson argues that a similarly situated, younger,
white employee –- Nicholas Bellosi -- was not disciplined as
severely as he was in 2006 and 2010. Bellosi, who was born in
1982, began working with the Detention Center in 2004.  Pl.

6

Resp. in Opp. Ex. 9 at 1-2.  According to a report from the
Detention Center, on December 13, 2009, a resident assaulted
Bellosi, leaving scratches and bruises on his face.  Id. at 3.
A nurse at the Detention Center treated Bellosi and released him
to return to work.  Id. at 4-5.  His supervisor wrote, "Mr.
Bellosi was instructed to call his Union Rep for further
instruction on whether he should leave or stay for the end of
his 3-11 shift", and he noted that he "felt Mr. Bellosi did not
suffer any physical, shift altering injuries to prevent him from
staying."  Id.  Mr. Bellosi then left for the day, apparently
without supervisory permission.  Id.  He returned to work the
next day with a note from a doctor saying that he was "medically
cleared to return to work."  Id. at 6.  Berry acknowledged that
Bellosi did not have supervisory permission to leave, Pl. Resp.
in Opp. Ex. 12 at 54:23-25, but he says it was his understanding
that Bellosi "felt that the treatment that he got from the nurse
was inadequate, that he was hurt, and that he was going to go to
his own doctor."  Id. at 54:7-9.

     Johnson avers that before he was fired, no one had
ever been fired for violating the cellular phone policy.  Pl.
Resp. in Opp. at 9.  In his deposition, Berry said he "believed"
he had fired someone for use of a cell phone, but he could not

recall the employee's name.  Id. Ex. 12 at 63:9-13.  Berry

recalled, "one of the staff had given his cell phone to one of

the kids to make a phone call.  And I believe I terminated him."

Id. at 63:16-18.  Johnson testified that a resident had used the

cell phone of an employee whose name he thought was Al

Harrington, but that Johnson did not believe Harrington was

fired.  Id. Ex. 11 at 105:21-106:14.  According to Johnson, Al

Harrington was African American.  Id. at 106:2.  Johnson's

counsel explains that an African American employee named Alan

Herring was suspended without pay for five days when a resident

used Herring's cell phone to call his girlfriend.  Id. Ex. 13 at

1.  Berry did not fire Herring; instead, Herring resigned more

than two years later.  Id. at 3.  After Johnson began grieving

his termination, Mark Murray, the director who succeeded Berry,

terminated two employees -- Christopher Guille and Michael

Fortune -- for violating the cell phone policy, see id. at 6-7.

Neither party provides information about Guille or Fortune's

race.

I.   Standard of Review

     A.   Summary Judgment

          A party moving for summary judgment bears the initial

burden of informing the district court of the basis for its

argument that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact", Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, Fed. R. Civ. P. 56 then obliges "the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324.

A factual dispute is genuine

> [I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law". Id. at 248.

We "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility

determinations or weigh the evidence." <u>Reeves v. Sanderson</u>
<u>Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000), cited in <u>Amour</u>
<u>v. County of Beaver, PA</u>, 271 F.3d 417, 420 (3d Cir. 2001)).

     B.    <u>The Pennsylvania Human Relations Act</u>

        The same legal standards and analysis govern claims of
race discrimination under the PHRA and Title VII and age
discrimination claims under the PHRA and ADEA.  <u>See, e.g.,</u>
<u>Goosby v. Johnson & Johnson Medical, Inc.</u>, 228 F.3d 313, 317 n.3
(3d Cir. 2000) ("The analysis required for adjudicating
[plaintiff]'s claim under PHRA is identical to a Title VII
inquiry, and we therefore do not need to separately address her
claim under the PHRA") (internal citation omitted); <u>Glanzman v.</u>
<u>Metropolitan Management Corp.</u>, 391 F.3d 506, 509 n.2 (3d Cir.
2004) ("the same legal standards and analysis are applicable to
claims under both the ADEA and the PHRA") (internal quotation
omitted).  Our Title VII and ADEA analyses will thus apply to
Johnson's PHRA claims as well.

     C.    <u>Race Discrimination Under Title VII</u>

        Under Title VII it is "an unlawful employment practice
for an employer . . . to fail or refuse to hire or to discharge
any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's race",
42 U.S.C. § 2000e-2(a).

As our Court of Appeals has explained, a Title VII
plaintiff can sustain a claim of discrimination under either a
mixed-motive theory[1] or a pretext theory.  <u>Makky v. Certoff</u>, 541
F.3d 205, 213 (3d Cir. 2008).  Here, Johnson pursues only a
pretext theory.  <u>See</u> Pl. Resp. 12-18.

The Supreme Court established the burden-shifting
framework for showing pretext in <u>McDonnell Douglas Corp. v.
Green</u>, 411 U.S. 792 (1973).  Under <u>McDonnell Douglas</u>, a Title
VII plaintiff "bears the burden of proof and the initial burden
of production, having to demonstrate a prima facie case of

---

[1] Under a mixed-motive theory -- which Johnson does not
pursue here -- a plaintiff can prevail by showing that an
employer made an employment decision in part because of
illegitimate reasons, even if the employer also had legitimate
reasons for the decision.  <u>Price Waterhouse v. Hopkins</u>, 490 U.S.
228, 241 (1989).  <u>See also</u> 42 U.S.C. § 2000e-2(m) ("an unlawful
employment practice is established when the complaining party
demonstrates that race . . . was a motivating factor for any
employment practice, even though other factors also motivated
the practice.").  A plaintiff can prove a mixed-motive case
using either direct or circumstantial evidence.  <u>Desert Palace,
Inc. v. Costa</u>, 539 U.S. 90, 101 (2003).  The statute provides a
partial affirmative defense whereby if an employer proves that
he "would have taken the same action in the absence of the
impermissible motivating factor", the plaintiff's remedies are
limited to injunctive relief, attorneys' fees, and costs.
<u>Makky</u>, 541 F.3d at 213.  <u>See also</u> 42 U.S.C. § 2000e-5(g)(2)(B).

discrimination". <u>Smith v. City of Allentown</u>, 589 F.3d 684, 689 (3d Cir. 2009). A plaintiff makes a <u>prima</u> <u>facie</u> case of a Title VII violation by showing "(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was either not hired or fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class." <u>Jones v. School Dist.</u> <u>of Philadelphia</u>, 198 F.3d 403, 410-11 (3d Cir. 1999) (internal quotations and emphasis in original omitted).

Our Court of Appeals has stressed that "[t]he central focus of the inquiry" of whether a plaintiff has made a <u>prima</u> <u>facie</u> case under <u>McDonnell Douglas</u> in a Title VII action is "always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." <u>Pivirotto v. Innovative Systems,</u> <u>Inc.</u>, 191 F.3d 344, 352 (3d Cir. 1999) (quoting <u>Furnco</u> <u>Construction Corp. v. Waters</u>, 438 U.S. 567, 577 (1978) (further internal quotations omitted). As the Supreme Court has explained, the method for making a <u>prima</u> <u>facie</u> case "was never intended to be rigid, mechanized, or ritualistic", <u>Furnco</u>, 438 U.S. at 577. A <u>prima</u> <u>facie</u> case of racial discrimination in a

disparate treatment case such as this one involves a showing

that the plaintiff was treated differently from similarly-

situated individuals of a different racial group.  See, e.g.,

Whack v. Peabody & Wind Engineering Co., 595 F.2d 190, 193 (3d

Cir. 1979).[2]

In Stanziale v. Jargowsky, 200 F.3d 101 (3d Cir.

2000), our Court of Appeals explained that, under McDonnell

Douglas, after the plaintiff has established a prima facie case,

> the burden of production (but not the burden
> of persuasion) shifts to the defendant, who
> must then offer evidence that is sufficient,
> if believed, to support a finding that the
> defendant had a legitimate,
> nondiscriminatory reason for the adverse
> employment decision.  An employer need not
> prove, however, that the proffered reasons

---

[2]As our Court of Appeals has explained, the Supreme
Court distinguishes between "disparate impact" and "disparate
treatment" theories of liability.  On the one hand, a plaintiff
in a disparate impact case must show that an employer has "used
a specific employment practice, neutral on its face but causing
a substantial adverse impact on a protected group, and which
cannot be justified as serving a legitimate business goal of the
employer."  E.E.O.C. v. Metal Service Co., 892 F.2d 341, 346 (3d
Cir. 1990).  On the other hand, a plaintiff in a disparate
treatment case must show that "an individual of a protected
group . . . ha[s] been singled out and treated less favorably
than others similarly situated on the basis of an impermissible
criterion under Title VII."  Id. at 347.  The plaintiff here
attempts to sustain a claim on a disparate treatment theory --
he makes no allegations about a specific employment practice and
instead argues that the Detention Center treated him differently
from similarly situated white employees because of his race.
See, e.g., Comp. at ¶ 34.

actually motivated the [employment]
decision.

Stanziale, 200 F.3d at 105 (internal quotations, citations, and
alterations omitted).

If the employer produces a legitimate, non-
discriminatory reason (or reasons) for the employment action,
the burden then shifts back to the plaintiff, who must prove by
a preponderance of the evidence that the employer's proffered
reasons are mere pretext.  Duffy, 265 F.3d at 167 n.1.  A
plaintiff may do this by producing evidence "from which a
factfinder could reasonably either (1) disbelieve the employer's
articulated legitimate reasons; or (2) believe that an invidious
discriminatory reason was more likely than not a motivating or
determinative cause of the employer's action."  Stanziale, 200
F.3d at 105.

D.  Age Discrimination Under the ADEA

The ADEA makes it "unlawful for an employer . . . to
fail or refuse to hire or to discharge any individual or
otherwise discriminate against any individual with respect to
his compensation, terms, conditions, or privileges of
employment, because of such individual's age", 29 U.S.C. § 623.

An employer is liable under the ADEA if an employee's age "actually motivated the employer's decision", and so an employee "cannot succeed unless the employee's protected trait actually played a role in th[e employer's decisionmaking] process and had a determinative influence on the outcome." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

In Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), the Supreme Court held that the burden-shifting framework established in Price Waterhouse v. Hopkins, 490 U.S. 228 (2008) for mixed-motive Title VII claims did not apply to claims under the ADEA. Instead, an ADEA-alleging plaintiff retains the burden of persuasion, and he must "prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Gross, 557 U.S. at 177-78.

Though the Supreme Court "has not definitively decided whether the evidentiary framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), utilized in Title VII cases is appropriate in the ADEA context", id., at 175 n.2, our Court of Appeals applies the McDonnell Douglas burden-shifting framework to ADEA claims. See, e.g., Kautz v. Met-Pro Corp., 412 F.3d

463, 465 (3d Cir. 2005); Smith v. City of Allentown, 589 F.3d
684, 689-91 (3d Cir. 2009).

III.  Application

  A.  Racial Discrimination in Violation of Title VII

    a.  Johnson's Prima Facie Case of Racial
        Discrimination Under McDonnell Douglas

      It is undisputed that Johnson meets the first three
elements of a prima facie case under McDonnell Douglas. See,
e.g., Johnson, 2012 WL 895507, at *8; Pl. Resp. at 13. As for
the fourth element -- whether the circumstances of Johnson's
termination give rise to an inference of unlawful discrimination
-- we found in denying the motion to dismiss that Johnson had
alleged facts that, if proven, would state a prima facie case,
in that he had "identified two types of comparator employees who
were treated more favorably than he: white employees who used
their cellular phones without discipline, and a younger white
employee who left his work assignment without discipline." Id.
at *8.

      In light of the evidence in the record, we now
consider whether Johnson has made a prima facie case of racial
discrimination based on these theories. We are mindful that in
reviewing a motion for summary judgment we must "review the

record as a whole," Hill v. City of Scranton, 411 F.3d 118, 124-
25 (3d Cir. 2005) rather than "parsing each issue", Snooks v.
Duquesne Light Co., 314 Fed. Appx. 499 (3d Cir. 2009).

Johnson has failed to adduce evidence to make a prima
facie case based on the Detention Center's application of its
cell phone policy.  Johnson argues that "[u]p until [his]
termination, no one had ever been so severely disciplined for
this violation", but the only specific employee he points to who
violated this policy and was disciplined less severely than he
is Al Herring, an African-American.  See Pl. Resp. at 17.  The
lack of comparable discipline Herring received thus does not
give rise to an inference of unlawful discrimination.  The
general assertions of the deposed employees that others used
cellular phones in violation of the policy and were disciplined
less severely than Johnson -- without any details as to the race
of these other employees or the specific terms of their
violations -- also do not show that Johnson was "subject to
discipline while other similarly-situated non-protected
employees were not disciplined", Wolfe v. Central Blood Bank of
Pittsburgh, No. 07-0254, 2007 WL 3023945, at * 7 (W.D. Pa. Oct.
12, 2007).

Johnson's evidence regarding the discipline he received for his cell phone use fails to make a prima facie case of racial discrimination, and so we turn to his allegations regarding the discipline he received for absenting himself from his work station.  In arguing that such circumstances surrounding his termination give rise to an inference of unlawful discrimination, Johnson relies heavily on his comparison to Bellosi, a white employee who left his workstation without supervisory permission and was not terminated.

In our Memorandum concerning the Detention Center's motion to dismiss, we found that although Johnson conceded that, unlike Bellosi, he was subject to a "last chance" disciplinary decision when he was fired, this potential difference was not fatal because Johnson contested whether he had absented himself from the work station at all, such that "the action of which he complains is not just termination but the leveling of false charges against him."  Johnson, 2012 WL  895507 at *9.  Because we found that the essence of Johnson's argument involving Bellosi as a comparator was that Johnson "was disciplined for conduct that he did not commit, while a white employee was not disciplined for conduct that he did commit", id. (emphasis omitted), we concluded that for purposes of this argument

Johnson and Bellosi were similarly situated.  But we were at
pains to explain that if Johnson conceded that he had absented
himself from the work station, "so that the adverse action of
which he was complaining consisted solely of terminating him for
that transgression, our analysis of whether Bellosi and Johnson
were similarly situated would be different."  Id. at n.5.

           1.    Whether Johnson Absented
                 Himself from the Work Station

                 i.    Whether Johnson Is Collaterally
                     Estopped From Litigating This Issue

Delaware County argues that Johnson is estopped from
claiming that he did not absent himself from his work station.
According to the County, "In the final arbitration of
Plaintiff's 2010 grievance, Judge Kenney specifically determined
(i) 'Mr. Johnson left the place of his work assignment'; and
(ii) 'Harlan Johnson is found to have absented himself from his
assigned duty station without supervisory permission.'"  Def.
Mem. in Supp. of MSJ (hereinafter "Def. MSJ") at 12.  Thus, "the
Detention Center submits Plaintiff is precluded from litigating
the identical issues regarding the stairwell in the instant
case."  Id. at 13.  See also Def. Reply at 3 ("issue preclusion
applies in the instant matter to preclude Plaintiff from re-

litigating the issue of whether the stairwell/locker area of the C-1 Unit was an assigned duty station for detention officers").

Under the doctrine of collateral estoppel, parties may not re-litigate facts or legal issues that earlier actions have resolved so long as "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action."  Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006); see also National R.R. Passenger Corp. v. Pennsylvania Public Utility Comm'n, 288 F.3d 519, 525 (2002).

Johnson does not contest that he was in privity with AFSCME, who brought the grievance, nor does he contest that the issue of whether he left his work station without permission is identical to the issue presented in the earlier action, nor that that action resulted in a final judgment on the merits. Instead, Johnson argues that the determination that he absented himself from his work station was not essential to Judge Kenney's decision.  Johnson reasons that Pennsylvania's judges retain the right to "select, discharge, and supervise court personnel" under the CBA, and so he concludes that Detention

Center employees are employees at-will, and Judge Kenney was thus "not legally obligated to find any specific reason to uphold Johnson's discharge." Pl. Resp. in Opp. at 19-20.

Our Court of Appeals explained the requirement that in order for collateral estoppel to apply, the issue the party seeks to estop must have been essential to the previous judgment: "if issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded." National R.R. Passenger Corp., 288 F.3d at 527 (quoting Restatement (Second) of Judgments § 27, cmt. h). The court in National R.R. Passenger Corp. found that the disputed issue there was essential to the judgment because if the prior court had decided the issue differently, the ultimate resolution of the case would have been different. Id. at 527. In determining whether the finding that Johnson left the place of his work assignment was necessary to Judge Kenney's decision, we will thus consider whether, had Judge Kenney found that Johnson did not leave his assigned work station, Judge Kenney could not have upheld the termination. In doing so, we bear in mind our Court of Appeals's admonition that "reasonable doubt as to which issues were decided by a prior judgment should be resolved

against using such judgment as an estoppel." <u>Chisholm v.</u>

<u>Defense Logistics Agency</u>, 656 F.2d 42, 50 (3d Cir. 1981)

(<u>quoting</u> <u>Kauffman v. Moss</u>, 420 F.2d 1270, 1274 (3d Cir. 1970)).

The determination of whether the finding that Johnson

was absent from his work station without supervisory permission

was essential to Judge Kenney's decision turns on whether

Johnson was, as he claims, an employee at-will. If Johnson was

an employee at-will, he could be fired for good cause, bad

cause, or no cause at all, <u>see, e.g.</u>, <u>Yetter v. Ward Trucking</u>

<u>Corp.</u>, 401 Pa. Super. 467, 473 (Pa. Super. 1991), and so the

determination that he had left his assigned station without

permission would not be essential to upholding his termination.

If Johnson were instead covered by the for-cause provision of

the CBA, Pl. Resp. in Opp. Ex. 1 at 35, then the determination

that he had left the work station would be necessary to uphold

the for-cause firing.[3]

The CBA contains a just-cause provision -- Article 20

-- which provides that "the Employer shall not discharge or

discipline any employee without just cause." <u>Id.</u> Ex. 1 at 35.

---

[3] Because, as we explain below, we find that reasonable doubt
exists as to whether the for-cause provision applied to Johnson,
we need not reach the question of whether the other alleged
ground for termination -- Johnson's cell phone use -- would have
been sufficient to support the firing without a finding that he
had left his work station.

By saying he is an at-will employee, Johnson thus suggests that this provision does not apply to Judicial District employees to whom the CBA otherwise applies.

We find reason to believe that Johnson was covered by the for-cause provision.  First, we note that the fact that judges retain the right "to select, discharge, and supervise court personnel" does not in theory require that court personnel be at-will employees.  An employer operating under a just-cause agreement retains the right to discharge employees so long as she finds that there is cause for the termination.

Next, in this case, the judges who conducted the grievance proceedings in 2006 and 2011 each acted <u>as</u> <u>if</u> Johnson was working under a just-cause regime.

In 2006, Judge Zetusky wrote that Johnson had been fired "for his absence from his assigned duty station", <u>Id.</u> Ex. 14 at 1, and he explained that Johnson had grieved his termination pursuant to Article 19 of the CBA, which defines a grievance as a "dispute . . . between an employee and the County . . . as to the interpretation of, application of or compliance with the provisions of this Agreement." <u>Id.</u> Ex. 1 at 31.  Judge Zetusky specifically referred to Article 20's provisions establishing a just-cause system and providing that an employee

risks immediate discharge for "[a]bsenting one's self without supervisory permission from the customary place of his work assignment . . . ." Id. Ex. 14 at 5 (quoting the CBA, id. Ex. 1 at 35).

Similarly, in 2011, Judge Kenney presented the issue regarding Johnson's firing as whether there was cause for termination: "The issues in the instant matter are as follows: (1) Whether Mr. Johnson was using his cellular telephone?; and (2) Whether Mr. Johnson, in using his cellular telephone, absented himself from the customary place of his work assignment without supervisory permission?" Am. Comp. Ex. A at 21, ¶ 9.

These arguments suggest that Article 20 of the CBA did cover Johnson, in which case he would not be an employee at will and the determination regarding his absence from the workstation would have been essential to Judge Kenney's decision.

But the caselaw gives us pause in reaching the conclusion that Johnson was covered by the just-cause provision of the CBA. In Ellenbogen, the Pennsylvania Supreme Court upheld the Pennsylvania General Assembly's amendment to the County Code making county commissioners the exclusive bargaining representative in collective bargaining proceedings under Act 195, the statute that allows public employees in Pennsylvania to

bargain collectively.  The Pennsylvania Supreme Court rejected

the judges' argument that this authority would hinder their

ability to administer the courts because

> [M]ost of those matters properly within the
> scope of mandatory bargaining . . . concern
> wages and other financial terms of
> employment, which do not affect judges'
> authority over the essential areas of
> hiring, discharging, and supervising of
> court personnel, and do not hinder the
> ability of courts to administer justice.

Ellenbogen, 479 Pa. at 438.

Similarly, in Commonwealth ex rel. Bradley v.

Pennsylvania Labor Relations Bd., 479 Pa. 440 (Pa. 1978), the

Pennsylvania Supreme Court found judges' argument that

"subjecting wages, hours and other terms and conditions of

employment, to bargaining will interfere with their ability to

administer justice", id. at 447 (internal quotation omitted).

In doing so, the court found that "so long as judges retain

authority to select, discharge, and supervise court personnel,

the independence of the judiciary remains unimpaired.  These

crucial areas of judicial authority are not infringed by

collective bargaining, which here will resolve matters involving

wages and other financial terms of employment."  Id.

Here the CBA provides for just-cause firing, a

provision that "affects" judges' authority over discharge, a

"central area" under <u>Ellenbogen</u>.  The CBA thus appears to affect discharge in a way that the CBA at issue in <u>Bradley</u> did not. Given the Pennsylvania Supreme Court's assurances in <u>Ellenbogen</u> and <u>Bradley</u> that the county commissioners would not be able to negotiate CBAs that affected judges' ability to fire Judicial District employees, a plausible reading of the CBA here is the one Johnson urges -- that Article 20 did not apply to him and he was an at-will employee.

We are mindful that we should exercise restraint as a federal court reviewing the state court's administration of its employees -- a central state court function -- and we find that we need not rule on whether Johnson was an at-will employee.  It suffices to say that Johnson has raised a reasonable doubt as to whether he was covered by the just-cause provision of the CBA, and, in turn, whether Judge Kenney's finding that he was absent from his work station without permission was essential to the determination.  Johnson has thus raised a reasonable doubt about whether collateral estoppel bars him from re-litigating the issue of his absence from his work station, and so, pursuant to <u>Chisholm</u>, we will decline to give Judge Kenney's finding preclusive effect.

ii.  Whether Johnson Has Raised a Genuine
Issue of Material Fact As to
Absenting Himself from his Work Station

Johnson concedes that he was in the stairwell area.

See Pl. Resp. at 6 ("On January 11, 2010, Johnson . . .

conducted an approximate five minute personal cellular phone

conversation in an area containing a stairwell and staff

lockers.").  The dispute is instead whether that area

constituted part of Johnson's assigned work station.  Id. at 8

("According to several other detention officers, the place where

Johnson conducted the cellular phone call was not, in actuality,

away from his assigned place of duty.").

Johnson cites the testimony of Preston McLaurin, a

Detention Center employee who was the assistant shop steward at

the time Berry fired Johnson, who averred that the stairwell or

locker area was not considered to be "away from [the] customary

place of work assignment", Preston McLaurin Dep., Pl. Resp. Ex.

5 at 32:8-11.  He further testified that he was not aware of

anyone who had ever been disciplined for going into that

stairway or locker room area.  Id. at 32:12-15.  The plaintiff

also points to the deposition testimony of David Johnson, who

represented the plaintiff as a shop steward at the time of the

termination.  David Johnson testified that at the time the

plaintiff was fired Detention Center employees "didn't need permission" to be in the stairwell area.  David Johnson Dep., Pl. Resp. Ex. 6 at 11:7-11.  Steven Tillery, another employee, testified that "[t]he abandoned of the post [sic], I think, was kind of fabricated" because Johnson "was still on the unit when they discovered him and, you know, I guess that's a technical thing between the juvenile center, but he was still right there on the unit but it just so happened to be out of the sight of the kids."  Steven Tillery Dep., Pl. Resp. Ex. 7 at 12:12-17. Finally, the plaintiff cites the testimony of Perium McCready, the training supervisor at the Detention Center:

> William Wilson: . . . If one of those detention officers is standing in the hallway where these two Es are for fire extinguishers, is he considered on the unit?
>
> Perium McCready:  Yes.
>
> Q:  Is he considered at his place of duty?
>
> A:  If he is where the two Es are?
>
> Q:  Right.
>
> A:  I would say yes.
>
> Q:  So he doesn't have to stay in the recreation area?
>
> A:  Okay --
>
> Q:  Is he supposed to stay in the recreation area?

A:  Yes.

Q:  So how is he in his place of duty if he's out here by the Es if he is supposed to be in the recreation area? . . .

A:  . . . The policy is someone is supposed to be in the day area.  That is what I am going to teach you.  If you're brand new, I'm going to tell you to stay in that area. Somebody needs to be in the day area, the recreation room.  Someone needs to be out there.

Q:  Now, in our example we've got two detention officers.

A:  Correct.

Q:  If one of them is in the recreation room, does the other one -- is he also supposed to say in the recreation room?

A:  Policy says yes.

Q:  What's the practice?

A:  They move around.  The needs of the kids.  It's the needs of the kids.  You got to move.  There are things in the office. You got to get out of the day area to get in the office to get the stuff.  If you want to go to the bathroom.  Sometimes they don't want to use the community bathroom, they want to use their own bathroom.  I understand that. . . . So there are times where you aren't always in the day area with two staff.  The rule is you're supposed to be there, though.

Perium McCready Dep., Pl. Resp. in Opp. Ex. 8 at 41:12-43:8.

The Detention Center argues that if we do not find that Johnson is collaterally estopped from arguing he did not leave his work station, our analysis should not turn on whether Johnson in fact left his work station because the question is not whether the employer's decision was correct, but whether "discriminatory animus motivated the employer".  Def. MSJ at 13.

We find that Johnson has raised a genuine issue as to whether he absented himself from his work station, and because -- if did not absent himself from his work station and was fired when a similarly situated employee did absent himself from his work station and was not fired -- these circumstances would permit an inference of unlawful discrimination sufficient to make a _prima_ _facie_ case, this disputed fact is material.

We thus find that Johnson has made a _prima_ _facie_ case of discrimination with regard to this ground for his termination.

### b.   The Detention Center's
### Burden Under McDonnell Douglas

The burden of production thus shifts to the Detention Center, which responds that it has "unequivocally established a legitimate non-discriminatory reason for Plaintiff's termination"; that is, "Plaintiff's breach of his 'last chance'

reinstatement to employment" and his violation of the policy

regarding assigned duty stations.  Def. MSJ at 10.

Specifically, the Detention Center contends,

> On January 11, 2010, plaintiff absented
> himself from his assigned duty station
> without permission by removing himself to
> the stairwell locker area of the C-1 Unit of
> the Detention Center.  As a result of
> plaintiff's actions, on January 19, 2010
> plaintiff was terminated from employment
> with the Detention Center for, in part,
> absenting himself from his duty station
> without permission.  The decision to
> terminate plaintiff was based, in part, on
> plaintiff's direct violation of Judge
> Zetusky's December 11, 2006 Order.

Id. at 7.

We agree that this argument meets the Detention

Center's "relatively light burden" of "articulating a legitimate

reason for the unfavorable employment decision."  Fuentes v.

Perskie, 32 F.3d 759, 763 (3d Cir. 1994).


               c.    Johnson's Burden:
                     Pretext Under McDonnell Douglas

The burden of production thus shifts back to Johnson

to show that "each of the employer's proffered non-

discriminatory reasons, was either a post hoc fabrication or

otherwise did not actually motivate the employment action (that

is, the proffered reason is a pretext)", id. at 764 (internal

31

citations omitted). In order to do this, Johnson must submit evidence which "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Id. at 762.

Johnson cannot meet his burden at this third stage of the McDonnell Douglas regime. As our Court of Appeals explained in Fuentes, "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken", instead, in order to survive summary judgment, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'", Id. at 765.

The evidence Johnson cites in order to show pretext is the argument that he did not absent himself from his assigned work station, Pl. Resp. at 16-17, and the comparison of his treatment and Bellosi's. Id. at 17-18. Johnson creates a

32

genuine issue of material fact as to whether he absented himself from his work station sufficient to make a _prima_ _facie_ case by introducing evidence that there was ambiguity as to whether the stairwell was part of his work station. That evidence includes testimony from the training director that though detention officers went into that area frequently, the policy was that they were not supposed to be there while they were on duty. Pl. Resp. in Opp. Ex. 8 at 41-43. This ambiguity does not, however, cast such doubt on the Detention Center's proffered reason as to allow the factfinder to find the Detention Center's argument "unworthy of credence."

Moreover, the evidence Johnson submits does not give rise to an inference that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Johnson and Bellosi may be similarly situated to the extent that, if Johnson did not absent himself from his workstation, he did not trigger the conditions of the 2006 order. But the difference in the conditions under which Johnson and Bellosi worked is relevant to our determination of whether Johnson has pointed to evidence from which a factfinder could reasonably believe that invidious discrimination was "more

likely than not a motivating or determinative cause" of the Detention Center's employment decision.

The evidence demonstrates that Johnson was working under a 2006 order which provided, "in the future if Harlan Johnson absented himself from his assigned duty station for any reason without permission, he will be subject to immediate termination." Def. MSJ at 6-7 (citing Pl. Am. Comp. Ex. A), and he was fired for a perceived violation of that order. Id. Even if Berry's belief was erroneous (because the stairwell was in fact part of the workstation) this error would not allow a factfinder reasonably to believe that discrimination was "more likely than not a motivating or determinative cause" for Johnson's termination. Again, in order "[t]o discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765.

As our Court of Appeals has explained, the plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix Credit Alliance,

34

Inc., 130 F.3d 1101, 1109.  Here, the employer's determination

that Johnson absented himself from his assigned work station was

not "plainly wrong" -- indeed, Judge Kenney agreed with the

determination, and the deposition testimony to which Johnson

points does not undermine its reasonableness.

　　　　We thus find that Johnson has failed to carry his

burden under the third prong of the McDonnell Douglas burden-

shifting framework.  We will therefore grant the Detention

Center summary judgment with regard to Johnson's claims of

racial discrimination in violation of Title VII and the PHRA.

　　　B.　Age Discrimination in Violation of the ADEA

　　　　Bellosi was born in 1982 while Johnson was born in

1957, and in the Third Circuit an ADEA plaintiff may establish

the fourth element of a prima facie case under McDonnell Douglas

by showing that he was treated less favorably than "a person

sufficiently younger to permit an inference of age

discrimination", Maxfield v. Sinclair Int'l, 766 F.2d 788, 793

(3d Cir. 1985).  Cf. Massarky v. General Motors Corp., 706 F.2d

111, 118 (3d Cir. 1983) (in order to make a prima facie case, "a

plaintiff alleging a discriminatory layoff need show only that

he is a member of the protected class and that he was laid off

35

from a job for which he was qualified while others not in the
protected class were treated more favorably").

Our analysis above regarding Johnson's <u>prima</u> <u>facie</u>
claim based on the comparison between his treatment and
Bellosi's applies to Johnson's ADEA claim as well, and we find
that Johnson has made a <u>prima</u> <u>facie</u> case of age discrimination.
Similarly, the Detention Center has met its burden of
"articulating a legitimate reason" for firing Johnson when it
says it fired him because of his "breach of his 'last chance'
reinstatement to employment, [his] lengthy disciplinary history
and [his] violation of the Detention Center's policies and
procedures regarding assigned duty stations and cell phones."
Def. MSJ at 10.

Yet Johnson has again failed to demonstrate that the
Detention Center's articulated reasons are pretext for
discrimination based on age. In the age discrimination context,
as in the racial discrimination context, Johnson relies entirely
on the comparison between his treatment and Bellosi's, and for
the reasons articulated above this comparison fails to provide a
basis for a reasonable factfinder either to disbelieve the
Detention Center's articulated reasons or to believe that an
invidious discriminatory reason was more likely than not a

motivating or determinative cause of the Detention Center's action.  Johnson's allegations do not create a genuine issue of material fact as to whether "age was the 'but-for' cause of" his firing.

Because Johnson has failed to meet his burden of raising a genuine issue of material fact as to pretext in order to survive summary judgment with respect to either his claims of racial discrimination in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq. or age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626, we hold that his claims under the Pennsylvania Human Relations Act must also fail.

IV.  Conclusion

For these reasons, we will grant the Detention Center's motion for summary judgment on all counts.

BY THE COURT:

/S/ STEWART DALZELL, J.